Thank you, Your Honor. Tim Hogan representing plaintiff's appellants in this matter. This case is on remand from the Supreme Court. The district court granted the defendant's Rule 60b-5 motion from which we appeal. The issue on the remand was whether or not the Nogales Unified School District now had programs in place that complied with the Equal Educational Opportunities Act. And as to the statewide injunction, whether or not that should be dissolved depended on whether the state itself was violating the Equal Educational Opportunities Act. The Equal Educational Opportunities Act, EEOA, requires educational agencies to take appropriate action to overcome language barriers that impede and I think the key to this case is equal participation in instructional programs. Our contention is that the intensive language acquisition model that Arizona has adopted, four hours of English language development every single day out of every school day, which represents about two-thirds of the school day, that that program denies students equal access to the academic curriculum and that it unnecessarily segregates English language learners after the first year, to which we do not object, by the way, despite the district court's finding to the contrary. How would keeping the injunction, which was about funding in place, address either of the claims that you were just describing? The judgment is about violation of the Equal Educational Opportunities Act, Your Honor. And, of course, at that time, in 2000, when the judgment was issued, we thought the case was about funding. And so there is some specific language about the inadequacies of funding and the impact of the inadequacies of that funding on the Nogales Unified School District. But fundamentally, the judgment is that the state, well, that Nogales and the state, once it was extended, are violating the Equal Educational Opportunities Act. And the very specific language of the remand from the Supreme Court talks about whether or not there are now programs, as opposed to funding, in place in the Nogales Unified School District. And with respect to the statewide injunction, whether or not the state itself is violating the Equal Educational Opportunities Act. And there's no reference in the remand with respect to it has to be funding or anything else. It's like modifying a consent decree in that respect. Can we do this? Obviously, this case has been going on for a very, very long time. But at its core right now, you've got a four-part test that the court had to apply, or at least looking at four different factors after the Supreme Court sent the case back. It went through those in great detail. I gather that your position is, well, we're okay with the first year. But after that, you're segregating these folks. And it's unfair because they're not getting the core curriculum that people who are not segregated have. Now, it puzzled me because that model permeates the entire educational structure. So, for example, if you have a child that's in an AP course, that child is segregated from the rest of the class, or vice versa, because of aptitudes that they have or don't have. What's the difference between if you have a child that's gifted in math and is an AP calculus, and I have a child that doesn't have that facility, why, under your theory, would either the person in AP be considered segregated or discriminated against or vice versa? What's the difference between that and what you've got here? Well, the difference is the Equal Educational Opportunities Act begins by saying you can't discriminate on the base of race or national origin, goes through A through E, and then gets to F by educational agencies taking appropriate action that impede equal participation. I think the operating assumption here behind the law and behind the discussion in Castaneda about why segregation is pernicious is because segregation of students on the basis of language is not equal participation. I think the court in Castaneda recognizes that some degree of segregation, no matter what program you have in place, is going to be necessary to achieve the educational goal, which is acquisition of the English language. And didn't the state and certainly the Nogales with the new superintendent and all the additional funding, doesn't everybody say, hey, we want to mainstream these folks as quickly as we can, and you're having tests after the first year, a lot of people go right in, they don't have any further segregation by your standard. But those who are having trouble, they're given extra time, they're worked with, so they can get into the mainstream as soon as possible. I get your point that they are missing the core curriculum that other people who don't have that burden have. But doesn't there have to be some flexibility? They want to get them in there. But if you have a child that cannot communicate in the language where, say, the math or the science course is being taught, how is that helpful to them, as opposed to what they're trying to do now, which is, and in some cases, they are actually teaching some of these core courses as part of the language training. How do they do it? Well, a couple of points there, Your Honor. First, with respect to wanting to mainstream, I think that's the goal of the initiative that was enacted by Arizona voters in 2000, because the whole point of sheltered English immersion at that point was that it was not intended normally to exceed one year. I mean, the hope was that those children would be mainstreamed after that period of time. But specifically to your point, but the model doesn't do that, and we know those kids aren't exiting after the first year, and so they remain in four hours of intensive English language development until they test proficient on the English language proficiency test. And what would you do? What would you do? What would you do to solve the problem? Well, the four-hour, you know, Costinator recognizes that there are two ways you can go about this. One is sequential learning, which the state has very obviously adopted in Arizona. We're going to teach you English first, and then hopefully at some point that will provide you. You don't like that one, so what's the other way? Well, I don't think that's correct, Your Honor. I'm indifferent to either one of these methods. What I don't like is unnecessary segregation of students when it isn't achieving the objective. I'm saying to you we don't want to do this, but these folks are not able to speak English well enough now that they can function well in the mainstream courses. It sounds to me like what you're saying is, well, in order to avoid the problem, they're not getting these basics, you need to conduct science and math in Spanish. Oh, no, not at all, Your Honor. Which would just continue the segregation. Not at all. Not at all. How do you solve the problem? What's a real-world solution? Let me give you an example, a big example and a big exception to the segregation of the students. This is all based on cost. When you don't have enough English language learners over a three-grade span to justify the creation of a separate classroom, those kids are mainstreamed. They're put into the mainstream classroom with everybody else for all subjects, English, math, science, social studies, everything. Those kids, and there's over 10,000 of them in Arizona, those kids reclassify at a higher rate than the kids in the four-hour self-contained classroom. And it's the record is full of how teachers. But there could be so many reasons for that, right? Those kids, by definition, live in a community where fewer people are not native English speakers, right? That's why there are fewer of them in the school, because most of the people in the school are speaking English. So maybe it's easier for kids who have everyone around them speaking English to learn English than it is for kids who have a lot of people around them speaking Spanish to learn English. If that's the reason, we can't assume that it would work in Nogales. And we have educational experts in Arizona who have made the determination that doing it sequentially is what makes sense. How can we question that? Well, you can question that by imposing the burden on the state of Arizona to, once you've adopted whatever methodology you're going to adopt, place the burden on the state of Arizona to justify the continued intensive segregation of these children. And so you're right. There may be a multitude of reasons why that population, although it's a large population, why that population is doing better than the children in the self-contained classrooms, at least as far as- Is that true in Nogales?  Is that true in Nogales? You're speaking statewide. You've got different districts doing different things. But in Nogales, which was the original focus of this lawsuit, how many people are because of, in quotes, funding are being taken from this course and placed in the mainstream situation are doing much better? I don't think very many at all in Nogales. There's about- You've got lots and lots of money, lots and lots of teachers, new administration, lots of focus. What are they doing wrong that you have a practical solution for?  In Nogales, right. Well, for example, in Nogales, the testimony in the case was that the State Department of Education allows Nogales to mix English language learners with non-English language learners as another exception. But that's the whole point, though, isn't it? The Supreme Court talked about the fact that there's supposed to be a great deal of discretion by district so that the school districts can focus on the unique characteristics, if there are any, in that district to meet the educational needs of those students. Instead of being a fault, isn't that a benefit to let them, instead of one size fits all for the state, you focus on the superintendent and others in Nogales focus on the requirements of Nogales. What's wrong with that? I don't think there's anything wrong with that. But it undermines the idea that somehow four hours of segregation continues to be necessary after a student hasn't exited after the first year. You would just, in four years, let's say you have a young man who has great difficulty learning any basic English at all and English is gibberish to him. So you put him in this mainstream and he just flounders. How does that help meet the requirements of the law any better than what they're trying to do right now? I'm not sure it does, Your Honor. And I'm not suggesting there shouldn't be individualized attention to students just like there is and should be in any classroom to take care of that. We're not talking about that, though. We're talking about a prescriptive statewide model that requires... Statewide. I mean, I think the record's pretty clear that you've got different school districts who do very different things. Let's see if I can give you an example here. I think there was the Humboldt Unified School District and the Amphitheater High School have a very different model than what you're doing in Nogales. You're really not speaking for the whole state. You're really focused on Nogales, are you not? That's not quite correct, Your Honor. The four-hour model of English language development is a mandatory requirement for school districts. The way it's applied, though, is different by district, is it not? They have the flexibility to apply some of that differently in different school districts. Once there is a population of English language learners at grade level, over three grades, over 20, that justifies the creation of a self-contained classroom, there's no option. That has to be put in place. But they can do it one hour at a time, divide it up over the day, or they can do it all in one block. They can have tutoring or they can have summer school. There are a lot of options for how they actually educate these students, right? Well, there's an option about, you know, when you do it, but there's not an option about the total amount of English language development in a self-contained classroom. So... Excuse me. Sorry, go ahead. Could I ask a question? Is there a mandatory requirement that they can only stay in school a certain number of times? That is, can they stay longer, a year longer? Can they have courses during the summer? Is it required that they treat them exactly the same as the English student as far as the amount of time they spend in school? That is something that varies from school district to school district. What's no balance? As the state points out, you could extend the school day for... Yeah, but what does Nogales do? Nogales has generally a compensatory instruction program that consists of English language development. Then it has tutoring and a summer program, and the tutoring is intended for reading and language development. And summer school is intended for language development and mathematics. Okay. Let me ask you one other question because it's fundamental and you haven't touched on it yet, and I'm only speaking for one-third of the panel. We don't get together and advance and talk about the cases. You rely mostly on Castaneda, the circuit case. I'm somewhat troubled by that. It's 30 years old. It's dicta. It's not a holding. The only way the Supreme Court cited it in the case that has sent the case down here was its flexibility approach, which we all agree with. I'm just wondering whether Castaneda is sort of out of date three generations, three decades ago, and I just am somewhat... I think we should take another look at it. Why do you feel we're governed by Castaneda? I know you and the United States government, the Attorney General, thinks that we should adopt it as wholly writ, but I'm somewhat concerned about the difference now and the new approach and what we've learned now over 30 years. Thank you, Your Honor. It's a good question. Start with the premise that over that 30-year... I mean, Castaneda has withstood the test of time is the other way to look at that, I suppose. It's been cited... The Castaneda dicta. It's been cited with approval by any number of courts. The Supreme Court, you know, wondered about the three-pronged test that Castaneda imposed, but later quoted with approval from Castaneda. The current Supreme Court quoted with approval the flexibility approach, but nothing further. But it had an opportunity there to say worse about Castaneda, and it didn't. I'm not so sure in this particular case you need to adopt Castaneda to agree with the plaintiffs that this four-hour model denies equal participation. It clearly does. But you don't challenge the first year of the four-hour requirement. So where does Federal law tell us that it's okay for one year and not okay for the second year? I don't think Federal law informs on that subject, Your Honor. But is it not? So then how can we say that this violates Federal law, what they're doing? I think it goes to the flexibility we've been talking about. A state adopts a methodology. And assuming that on its face and it's supported by this would resort to Castaneda, I suppose, that there is some, you know, expert support or that it's a recognized model of some kind, although in this case the Arizona four-hour model is, you know, the first of its kind on a statewide basis in the United States. But I think you have to give something a chance to work. And that was our position. You know, the state says we're going to use intensive language instruction four hours most of the school day, and we're saying the kids are going to act. That would be great. That would be terrific if that happened. That doesn't happen. And so you can't ignore what happens, the results, once the State is, you know, is allowed to exercise that flexibility, and then it just doesn't work. You're saying that the four-hour program doesn't work. Is that what you're saying? In terms of the State's goal of exiting those kids, the ambitious goal was we're going to put as much time on task as possible, and these kids are going to learn English within a year. No, that's not working. But do we actually have evidence in the record of that? I thought part of what you were saying was we don't really have evidence of how this is working because it didn't go into effect until 2008, and we really only have data in the record until 2009. And so how do we even know if it's working? Well, we don't know. We do know that they're not exiting within a year, which is the State goal. That's in the record. What we don't know is the overall effectiveness of the program because it had only been in effect two years at the time of the hearing in this case, and the Department of Justice points out, and we pointed out much earlier, that it would be premature to say that the program is effective. But what you can say with certainty, it isn't achieving the State's goal. And the ---- But where in Federal law does it say that the State has to achieve its exact goal or it's illegal under Federal law? It just doesn't say that anywhere. What I think the EEOA speaks to is equal participation, and segregation where it's not needed is not equal. Thank you very much. Thank you, Your Honor. Appreciate it. We'll now hear from the State and, I guess, the intervenor. Remind me again what you're going to talk about, Luis. I won't ask you the wrong question. Your Honors, again, my name is David Cantelmi representing the legislative intervenors. I will take Nogales, and my colleague, Ms. Julian, is going to take the statewide issues. That's good. Your Honors, I'm going to deviate a little bit from my outline because I think in listening to counsel's argument and to questions from the Court, I think you can boil this case down to really a very narrow concept, and that is the notion of sequential learning versus simultaneous learning. And the evidence before the task force was that sequential learning was a sure methodology and it would work. Simultaneous learning, that is, you're trying to learn both English and the content at the same time, wasn't so sure. And the Chairman testified before the district court, that being the case, they were going to go with a sure bet because they knew that sequential learning would work. Children would learn English unless they had some other disability, and then you have to address that otherwise. But children without some kind of learning disability will learn English with sequential learning. Time on task. How much deference should we put on the efforts of the State to try to get this right? I think you talked about the task force. That's when like 31 people or something like that or 33 people got together and studied the issue carefully, and they were the ones that made the recommendation about sequential learning, right? That's indeed the case, Your Honor. And they also made some findings about the contrary of, I guess, immediate immersion without training. So they concluded that the way this is being applied in Nogales, albeit imperfect because we're all humans and we all have different abilities and all that sort of thing, that they concluded that in an imperfect world, this was the best solution. Is that a fair statement? I think that's a fair statement, Your Honor. Okay. If that's a fair statement, then how much deference should we give in terms of what the district judge here to his finding that basically these folks really tried really, really, really hard to get this right, and it may not be perfect, but it complies with the law? Your Honor, I think you have to give substantial deference. Judge Collins did. And he, throughout the case, and again, bear in mind, Your Honor, we tried this to him two or three times, and throughout, he never substituted his judgment for those of the experts, for those of the superintendents, for those of the educators. He always deferred to them when deference was appropriate. And his findings, which have never been, not a single one of his findings of fact have been challenged as clearly erroneous, not one. And he clearly found that Nogales had an effective ELD program. And that being the case, that's really the end of the case. If Nogales has an effective ELD program, which he's found, and based on enormous evidence and a huge record, they satisfy the EOA in that case. But to come back to my outline to make sure I don't miss an issue, I have five main points that I want to make, Your Honor. Could you answer a question for me before you come to your issue, your issues? Suppose a person has culturally or for their own ability an inability to learn English, and you keep them in the program then for their entire high school. Is that correct? I don't think so, Your Honor. I think after two years, if they're not reclassifying to the next steps up, bear in mind there's four levels, and the fifth is proficient. Yes. If they're not making the ordinary progress, then that means there's something else there that's affecting that child's learning. And you need to intervene and address whatever those are. It could be home. It could be a disability. It could be anything. But after two years, if they're not moving, then those schools are supposed to readdress it. So I understand the issue is, if I understand it, we're trying to get these people into society. If they don't get the language, they're not going to get into society, whether you know calculus or not. So your focus, as I understand it, is to get them language proficient. But if they're not making that, then they become a special case, and then you have special programs? I think after two years, if they don't reclassify, it's supposed to be addressed to find out why not, what the issue is. And then there's a learning disability that needs to be addressed under the IDEA. You bring in the various panoply of methods to diagnose what the problem is. Yeah. And you move forward. So some of them may stay in attempting through their entire process or have something different that they're not completely mainstream because they are different. I think you have to look, Your Honor, what is the issue? I'm not saying that's wrong. The Supreme Court talked about flexibility. No, I understand. But I want to address your point. Well, address my point this way. We're talking about individuals, right? Yes. And groups. Yes. And I'm wondering how it works with all of them are alike. Do we want them to get as proficient as English as you can? Because we want to mainstream them, and you don't mainstream them if they only know Spanish. You look at why they're not reclassifying. Is it oral skills? Is it reading? Is it writing? Is it grammar? And you need to address. And many children become proficient in these three strands, but not necessarily in the grammar strand. And so then you need to address what those issues are. I see. Where in the record does it talk about this evaluation after two years? Because I thought Flores was saying that some people are in for much longer than two years. I would have to find it, Your Honor. I don't have it at the tip of my tongue. But is it fair to say, though, in response to Judge Wallace's question, that after two years, if there is a continuation in the program, they're not being mainstream, then there's individual attention paid to individual students to try to determine in that student's case why they're not making progress. If it's a home thing, then maybe you've got counselors that are involved. If it's a medical thing, you try to get other people involved. Is that a fair statement? Your Honor, yes. I think it's a fair statement that to come back to your question, Your Honor, if you look at the testimony from the superintendent, and I believe it's quoted at pages 12 to 13 of my brief, they're always looking at the individual needs of those kids. And that's the duty of the teacher for any child. It's not just an ELL child, but any child. If you're doing your job, fulfilling your job, you're looking at the individual needs of the kids. And in Nogales, the superintendent testified, and let me pull it out, if I might. I don't immediately see anything on 12 to 13 that talks about a trigger at two years. It does not, Your Honor. It does not. It's not specifically at two years. The point is that they're looking at all the time at what the needs of these children are to try to address whatever those particular needs are. And I think that's a fair summary of his testimony at that point. Does HB 2064 cut off funding after two years for an individual student for English language study? It cuts off the Group B weight, which is not the only source of funding. But, yes, after two years, the Group B weight ends. That's true. There's been a lot of money that's come into the district, though, is there not? There's some Federal money. There's State money. As I recall, the — maybe I'm wrong about this, but I think that the parents in the district agreed to a property tax overlay or something that brought more money, like $700,000 more or something like that. Am I wrong about that? You're exactly right, Your Honor. Money has increased from a number of sources. One, the local residents did vote for the override, which increased local funding. State equalization aid, which is meant — intended to bring all districts up to a certain par, has increased. Federal funding has increased. All sources of funding have increased over the last — It's a 44 percent increase or something. Is that right? Substantial. I don't remember the exact percentage, but it's in my brief. It's a substantial increase in funding. And, of course, you have the accountability from No Child Left Behind, because No Child Left Behind requires every district to set its annualized measurable achievement objectives. It requires assessments, which are now statewide. It imposes sanctions if a school is not meeting its AMAOs. And that can go as far as closing the school. Now, that's way down the line. It's not what happens at the beginning, but eventually that can happen. And, of course, NCLB increased funding substantially. I had a question about how to understand the data that you cited. It's a kind of detailed question. But the FEP2, is that a student who has been out of the English program for exactly two years or two years or more? I believe it's proficient for two years at that point. That's what they're looking at. You're supposed to test for the first year out and the second year out. And if you are reclassified at the end of the second year, you go into the mainstream and you're not followed anymore. So FEP2 is just that one year. You don't continue to be called an FEP2 after the second year. After the second year.  All right. Well, I'll go fast, Your Honor. The last point that I'd like to make is that the testimony, the record is replete, sequential works. It was appropriate to choose that. And I think deference should be given to the decisions made by the task force and the experts that they consulted. Now I will turn it over right on time to Ms. Jordan. Yes, indeed. Thank you. May it please the Court. And good morning. My name is Melissa Iyer Julian, and I represent the superintendent of public instruction for the state of Arizona. I'll be addressing my arguments, limiting them to the statewide nature of the injunction. And the district court's order vacating that injunction on a statewide basis was correct for two reasons. First, because the Nogales class of plaintiffs, which included only Nogales students and their parents, did not have standing to pursue a statewide violation of the EEOA. And second, because even assuming they had standing, as the district court found, they did not prove that Arizona is violating the EEOA on a statewide basis. And for that reason, there was the explicit instruction from the Supreme Court that in the absence of proof and in the absence of standing, the district court had to vacate the injunction. As to the issue of standing, the Supreme Court in Lewis v. Casey recognized that standing is not dispensed in gross, so that the one here so I understand that you disagree with their argument about the four-hour requirement, but let's just assume that the State really does, and I know you dispute the merits, but say the State really did impose a four-hour requirement for every English language student across the State, and I know you disagree on the merits of this, too, but say that was segregation, and we think under Federal law that counts as segregation. If that were true, then wouldn't they have standing to challenge it statewide? I take it that your argument is more that they lose on the merits than that it's impossible for someone in the State to have standing to challenge that requirement, which, if it did apply statewide, would be a statewide requirement. Simply by virtue of the fact that a policy applies statewide doesn't give a plaintiff standing to challenge it unless they're harmed by the policy and doesn't give them standing to represent a statewide class when there isn't a demonstration that the statewide policy is having the same impact on a statewide basis as it's having on the plaintiff. The only question I have about that, though, is this case, when did it start, 1992? Ninety-two. Ninety-two or something like that, so up until this point, these folks have been purportedly representing statewide plaintiffs, and nobody seems to have made a big deal of this before. Can we now impose a gloss of Lujan over this point? I mean, let's just, for purposes of our discussion, let's assume they lose on the merits. Just argument, don't worry, for purposes of our discussion. The standing issue, really, I know that can come up any time, but since people have assumed standing, I guess, why is that something we should be concerned with now? Is it just something we have to consider whenever we see it? It is because it's jurisdictional under Article III, Section 2 of the Constitution. And, you know, without a statewide injury that the Nogales plaintiffs are entitled to address for, they don't have a case or controversy that can be remedied in Federal court. And for that reason, the court, even at this late stage in the litigation, does, when presented with the issue, need to evaluate whether the Nogales class of students who do not attend school outside of that district have challenged the statute. I think you're one-third of the panel. I agree with your standing issue. It's like pregnancy. You're either pregnant or not pregnant. You're standing or you don't have standing. A weak don't have power to act unless there is standing. What is the basis upon which there was standing found initially for this action? Or was standing ever discussed in the record? Well, I think the important thing is that in this case, when the lawsuit commenced, which is when standing is typically evaluated, the plaintiff class wasn't pursuing a statewide violation. When they filed their lawsuit, their allegations and their intent was to pursue claimed violations as they existed in Nogales only. It wasn't until after judgment was entered in 2001 that the injunction was expanded statewide. So can you say what was at that particular point, what was shown to the district court to show that there was Federal jurisdiction under the Constitution for action? That would have been the evidence that was presented by the plaintiffs and during the trial that led to the 2000 judgment. And at that time, the evidence presented was solely as to the deficiencies in the Nogales program, the deficiencies that Judge Marquez identified in teaching in class sizes, in all of the things, all of the deficiencies that now 15 years later, at the time 13 years later, the lower court is found to be remediated, but those conditions were limited to conditions for ELL programs as they existed only in Nogales. So was there any evidence at all in the record that Nogales is typical of everything that happens in the State, or is it just assumed? It was assumed at that point, and that's precisely why the supreme court in its remand order pointed out that there was never any evidence to support that the either that there was a statewide violation of the EOA or that the violations identified in Nogales in 2000 were happening on a statewide basis. Judge Alito was pretty clear on that. Hasn't there been, though, I know there was in California, I think in Arizona, a movement to make certain that districts were treated equally as far as funding was concerned? When this was filed in 1992, one of the things that was raised was the funding issue. That was a statewide issue, was it not? It was a statewide issue. Would they not have had standing, at least as to that, to move forward in 1992? Because the application of funding, and not just the funding that comes from the Group B weight that's earmarked for ELLs, the supreme court recognized, and the same is true today, that districts receive funding from a variety of sources, and all of that funding can and is utilized to supplement the education programs The reality is that in 1992 it wasn't equal, and the Constitution probably required that it was. But I guess to get down to the bottom line, times change, facts change. Your point is that at the present time, on remand from the supreme court, all that's changed. Anything that might have given these plaintiffs standing to represent a statewide class of plaintiffs has now gone. Nogales is Nogales. It has its own issues. Everybody else has their own issues. There is no uniformity, and these plaintiffs cannot show they represent or are typical of anybody in some other school district. Is that correct? That's correct, Your Honor. And in fact, even though ruling, reserving its ruling on the issue of standing until later, the district court still gave the plaintiffs in this case the opportunity to prove the statewide violation that they were alleging. They got almost a year of discovery and a 22-day trial. And at the end of the day, the district court found that evidence from a few isolated districts, anecdotal evidence at best, was simply not sufficient to meet the standard that the supreme court set on remand in this case, which was a requirement of a showing that there was an EOA violation happening systematically. And so in order to reverse that finding, this Court would have to find that it was implausible and completely unsupported by the record. And the reality is that plaintiffs, even in arguing in their argument on appeal, can't point to overwhelming evidence that refutes the district court's findings. Your co-counsel, I believe it was, made the point that the district judge made a lot of factual findings and that those had not been challenged by the plaintiffs. Is that your position as well, that since they were not challenged, that we need to accept those as being true and that that would, in fact, yield the result that you want? Yes, Your Honor. The standard of review when the district court has made findings of fact is a clearly erroneous standard, and its conclusions of law are reviewed for an abuse of discretion. The plaintiffs, in making their arguments with respect to the task force model, are not challenging any of those findings as clearly erroneous, and so they must be accepted as valid and supportive of the conclusions reached by the Court on legal grounds. In this case, that there wasn't a statewide violation of the EOA happening in the ways that the plaintiffs theorized, the academic deficits and the purported segregation resulting from the model simply wasn't proven. And in the absence of that proof, the district court did not abuse its discretion in vacating the injunction, either as to Nogales or on a statewide basis, because we've come to a point in this litigation where everyone, including the plaintiffs to their credit, agree that ELL students in Nogales have effective programming. They're overcoming their language barriers and participating not just equally, but exceptionally, by outperforming their mainstream peers when they reclassify. So what this case has come down to is the plaintiffs wanting to use a Federal injunction to challenge every change to State policy because they disagree with it. The district court was not – did not abuse its discretion in finding that the reasons for maintaining an injunction in this case no longer exist, and it should be affirmed. Kennedy. Any other questions about my colleagues? We thank you all for your presentation. We know you've spent a lot of time on it. We will give it our best efforts, and we thank you. The court stands adjourned for the day.
judges: Wallace, Smith, Friedland